# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### *Alexandria Division*

**Susan Gibbs**,

    *Plaintiff,*

    v.

**Wal-Mart Associates, Inc.,**
**Wal-Mart Stores East, LP**,
**Wal-Mart Stores, Inc,** and
**WSE Management, LLC.**

    *Defendants*.

Case No. 1:22-cv-680

## COMPLAINT

1.    Plaintiff Susan Gibbs, by her undersigned counsel, brings this Complaint against Defendants Wal-Mart Associates, Inc., Wal-Mart Stores, East, LP, Wal-Mart Stores, Inc., and WSE Management, LLC (collectively, "**Wal-Mart**") for violations of Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12111-17 (the "**ADA**") and the Virginia Human Rights Act, Va. Code. §§ 2.2-3900 to 2.2-3909 (the "**VHRA**") seeking equitable and monetary relief, as follows:

## PARTIES

2.    Ms. Gibbs is a 76 year-old resident of Charlottesville, Virginia, an honorably-discharged veteran of the United States Army, and, since March 9, 2016, an employee of Wal-Mart.

3.      Defendant Wal-Mart Associates, Inc. is a Delaware corporation with a principal office address of 702 SW 8th St., Bentonville, Arkansas 72716. Wal-Mart Associates, Inc. was the named defendant in a worker's compensation claim that Ms. Gibbs filed. Wal-Mart Associates, Inc. is a joint employer of Ms. Gibbs together with the remaining Defendants.

4.      Defendant Wal-Mart Stores East, LP is a Delaware Limited Partnership registered in Virginia. It is a wholly-owned subsidiary of Defendant Wal-Mart Stores, Inc. Wal-Mart Stores East, LP is a joint employer of Ms. Gibbs together with the remaining Defendants.

5.      Defendant Wal-Mart Stores, Inc. is a Delaware corporation with the same principal office address as Wal-Mart Stores East, LP. It is publicly traded using stock ticker WMT. Its filings with the United States Securities and Exchange Commission indicate that it is 100% owner of Defendant Wal-Mart Stores East, LP and thus may be liable for the debts of Defendant Wal-Mart Stores East, LP.

6.      Defendant WSE Management, LLC is a Delaware Limited Liability Company. Various publicly-available documents indicate it may be the general partner of Wal-Mart Stores East, LP and thus may be liable for the debts of Defendant Wal-Mart Stores East, LP.

7.      Wal-Mart operates in Virginia under multiple names, including Wal-Mart Supercenter #1780, which it uses to transact business at its store located at 975 Hilton Heights Rd, Charlottesville, VA 22901 (the "Charlottesville Store"), where it employs Ms. Gibbs.

### JURISDICTION AND VENUE

8.      This Court has jurisdiction over Ms. Gibbs's ADA claims pursuant to 42 U.S.C. § 2000e-5(f)(3).

9.    This Court is an appropriate venue for Ms. Gibbs's claims because Ms. Gibbs's claims arose in Virginia and a plaintiff bringing ADA claims may elect to bring them "in any judicial district in the State in which the unlawful employment practice is alleged to have been committed . . . ." 42 U.S.C. § 2000e-5(f)(3).

**FACTS**

10.    On March 9, 2016, Ms. Gibbs started working for Wal-Mart at the Charlottesville Store.

11.    Ms. Gibbs works in the Asset Protection Department as a Customer Host.

12.    On January 19, 2021, Ms. Gibbs saw her podiatrist, Dr. April Nizami of the Veterans Administration outpatient clinic in Charlottesville, Virginia, about pain in her right foot and a lump that had appeared on the right side of her right foot.

13.    Dr. Nizami initially diagnosed Ms. Gibbs with arthritis but planned to take a closer look later.

14.    Dr. Nizami gave Ms. Gibbs a Certificate of Illness/Injury that claimed that Ms. Gibbs was disabled due to injury, that she could resume regular duties, but "Please allow Ms. Gibbs to sit during her duties and wear a post op shoe for one month." (the "January 2021 Certificate")

15.    Ms. Gibbs began wearing the "post-op" shoe that Dr. Nizami recommended.

16.    Also on January 19, 2021, Ms. Gibbs went to the Charlottesville Store to deliver the January 2021 Certificate to her department head, Asset Protection Manager Ken McEwen, and request that Wal-Mart comply with Dr. Nizami's recommendation for a seated position and permission to wear a post-op shoe.

3

17.    She found Mr. McEwen together with another member of management, Mike Riner.

18.    Ms. Gibbs informed them both of Dr. Nizami's recommendation, and Mr. McEwen responded that "I've got just the job for you," adding, "and you're so good at it."

19.    Mr. McEwen assigned to Ms. Gibbs the task of working at an "onsite check" that screened employees entering an employee entrance for COVID-19.

20.    Mr. McEwen declined to look at or take a copy of the January 2021 Certificate, but told Ms. Gibbs that she should keep it in case anybody needed to see it.

21.    While working at the on-site check, Ms. Gibbs was able to sit, in accordance with Dr. Nizami's request.

22.    On February 20, 2021, one month after Dr. Nizami issued to Ms. Gibbs the January 2021 Certificate—that requested a one-month accommodation—Ms. Gibbs was still experiencing foot pain.

23.    Ms. Gibbs spoke with then-store manager Michael Cunningham, informing him of the expiration of Dr. Nizami's request in the January 2021 Certificate.

24.    Ms. Gibbs asked Mr. Cunningham if Gibbs should stop working at the on-site check, and he told her to stay where she was.

25.    Shortly thereafter, Mr. McEwen told Ms. Gibbs that Mr. Cunningham had told McEwen that Ms. Gibbs wanted to cut her hours, which was not true.

26.    Ms. Gibbs responded that that was not what she said to Mr. Cunningham and Mr. McEwen made no further comment.

27.    Within days, Wal-Mart relocated its on-site check from the employee entrance where it had been located to a station behind a curtain at the public entrance.

28.    Wal-Mart simultaneously assigned Ms. Gibbs to work the on-site check at the new location.

29.    While working there, Wal-Mart required Ms. Gibbs to cover for other employees when those employees went on either 15-minute or one-hour breaks.

30.    Those tasks required that Ms. Gibbs frequently stand, putting pressure on her hurt foot.

31.    To compensate for the pain when she walked on her foot, Ms. Gibbs began altering her gait.

32.    On March 3, 2021, Ms. Gibbs met again with Dr. Nizami.

33.    Dr. Nizami again gave Ms. Gibbs a Certificate of Illness/Injury, once more indicating that Ms. Gibbs was disabled due to injury, that she may perform regular duties, and that she should continue to wear a post-op shoe (the "March 2021 Certificate").

34.    Dr. Nizami again recommended sitting, this time recommending "sitting as needed through her shifts."

35.    Dr. Nizami further stated that Ms. Gibbs would be reassessed on April 20, 2021.

36.    Ms. Gibbs gave the March 2021 Certificate to Mr. Cunningham on March 4, 2021 at 11:00 am.

37.    Ms. Gibbs continued to work the on-site check, continuing to stand when required to fill-in for colleagues on breaks.

38.    On or about March 7, 2021, Mr. McEwen began changing the schedules of staff in Ms. Gibbs's department.

39.    As a result of those changes, Ms. Gibbs was more often left alone at the front door.

40.    As a result of being more often left alone, Ms. Gibbs was obliged to spend more time on her feet.

41.    On March 30, 2021, Mr. Cunningham assigned Ms. Gibbs to watch the door in the Lawn and Garden department, stating that there was a stool by the door she could use.

42.    But Mr. Cunningham left Ms. Gibbs without a walkie-talkie to communicate with colleagues.

43.    Additionally, Ms. Gibbs was the only staff member assigned to that department.

44.    As a result, she was frequently obliged to get up and down to assist customers.

45.    Towards the end of the day, Ms. Gibbs observed an occupant acting suspiciously.

46.    Ms. Gibbs walked to Mr. Cunningham, favoring her injured foot as she did, to inform him of the shoplifter.

47.    She also informed Mr. Cunningham that she could not stop any suspicious occupant alone in her condition.

48.    She told Cunningham that when she was forced to stand or walk while wearing the post-op shoe, she could feel strain and discomfort in her knee, hip, and back.

49.    Mr. Cunningham responded by telling Ms. Gibbs to close the gate at the Lawn and Garden Entrance.

50.     Then, on April 6, 2021, when Ms. Gibbs reported to work Mr. Cunningham told her that the on-site check was moving once more.

51.     He had her follow him, and as she followed she pulled the screen with her across the store.

52.     When they arrived at the other end of the store, Market Manager James Hornsby was waiting.

53.     Mr. Hornsby directed another employee, who was mopping the floor, to give the mop to Ms. Gibbs.

54.     Mr. Hornsby directed Ms. Gibbs to mop the floor, which she did while on her feet.

55.     On April 20, 2021, Ms. Gibbs again saw Dr. Nizami.

56.     At this appointment, Ms. Gibbs and Dr. Nizami reviewed Ms. Gibbs's recent MRI results.

57.     The MRI revealed "3rd metatarsal stress fracture/bone marrow edema."

58.     Dr. Nizami and Ms. Gibbs decided that Ms. Gibbs should take medical leave temporarily to give Ms. Gibbs's foot time to heal.

59.     Dr. Nizami also said that, while Ms. Gibbs's arthritis could not be blamed completely on Ms. Gibbs's work with Wal-Mart, the stress fracture was likely due to chronic overuse due to lack of reasonable accommodation.

60.     Dr. Nizami also told Ms. Gibbs that Ms. Gibbs should be standing or walking no more than 5-10 minutes every hour.

61.     In the Certificate of Illness/Injury that Dr. Nizami provided, she wrote, "Despite past work accommodations, patient's foot condition has clinically progressed. She is to stay out

of work for further testing and to prevent worsening in the interim. May be able to return to work after reassessment in 3 months." (the "April 2021 Certificate").

62.    Ms. Gibbs turned the April 2021 Certificate into a Human Resources professional at the Charlottesville Store, Ebony Langhorne.

63.    Wal-Mart's third-party disability claims processor, Sedgwick, initially denied Ms. Gibbs's claims for disability insurance benefits, imposing a financial hardship on Ms. Gibbs.

64.    Thus on or about June 28, 2021, Ms. Gibbs spoke with Mr. McEwen about returning to work with a reasonable accommodation.

65.    On June 30, 2021, Ms. Gibbs perfected a charge of discrimination with the EEOC that she initiated on June 28, 2021.

66.    The EEOC assigned that charge case number 438-2021-00983.

67.    On her Form 5, Ms. Gibbs had checked the box for "disability discrimination" and described initially being accommodated but then being required to stand and move repeatedly.

68.    She stated that she believed that she was being denied a reasonable accommodation.

69.    On June 30, 2021, Ms. Gibbs met with Dr. Nizami again, and Dr Nizami released Ms. Gibbs to return to work as of July 1, 2021.

70.    In the Certificate of Illness/Injury (the "June 2021 Certificate"), Dr. Nizami called Ms. Gibbs disabled by injury, writing, "Please allow Ms. Gibbs to continue use of post op or prescription shoe and to be seated throughout her shifts. Her condition will be reassessed in 90-120 days.

71.    On the same day, Ms. Gibbs visited the Charlottesville store to give Wal-Mart the
June 2021 Certificate, and found Ms. Langhorne was not in.

72.    Instead, Ms. Gibbs spoke with Assistant Manager Nicole Johnson.

73.    Ms. Johnson refused to accept the June 2021 Certificate, telling Gibbs to come
back the next day and punch in at her usual time.

74.    On July 2, 2021, Ms. Gibbs met with Ms. Langhorne and gave Ms. Langhorne the
June 2021 Certificate.

75.    Ms. Langhorne told Ms. Gibbs that Langhorne put a yellow sticky note on the
June 2021 Certificate and put it on Mr. Cunningham's desk.

76.    Ms. Gibbs returned to work on July 2, 2021, and found the on-site check had been
relocated to a back hall away from the public entrance.

77.    Ms. Gibbs was able to sit throughout her shift.

78.    The next day, however, July 3, 2021, Ms. Gibbs returned from a break to find Mr.
McEwen watching the door Ms. Gibbs was assigned to, and Mr. McEwen appeared unhappy
about it.

79.    A few hours later, at about 7:00pm, Mr. McEwen sent a co-worker named Gary to
tell Ms. Gibbs to work a public door because, otherwise, someone would have to be moved from
another department to do so.

80.    Gary told Ms. Gibbs that Gibbs could use a stool, but Ms. Gibbs told Gary that
working the public door also meant locating carts for customers, returning them, finding
managers, and additional tasks that would require Ms. Gibbs to be on her feet.

81.    A heated discussion ensued between Mr. McEwen and Ms. Gibbs.

82.     Ms. Gibbs asked Mr. McEwen if McEwen had read her doctor's note (referring to the June 2021 Certificate).

83.     Mr. McEwen told Ms. Gibbs "we don't do that anymore."

84.     Then he told her that if she did not do as instructed, she could punch out and go home.

85.     He told her that the only reason he had "let" Ms. Gibbs come back to work was because he was "being nice."

86.     He told her that perhaps she should go back on leave and return when she was well.

87.     Ms. Gibbs carried a stool to the assigned door and immediately encountered a customer that needed assistance finding an electric cart.

88.     Ms. Gibbs began looking for an electric cart for the customer and encountered Gary, who found the cart for Ms. Gibbs.

89.     On July 4, 2021, Ms. Gibbs spoke with Mr. Cunningham about the discussion she'd had with Mr. McEwen.

90.     Mr. Cunningham told Ms. Gibbs that Ms. Gibbs could work the on-sight check but that she would have to fill in at the public door while other personnel took breaks.

91.     At this time, the store had sufficient staff on-hand that Wal-Mart could have assigned an associate without an injured foot to fill in at the front door during breaks.

92.      Mr. Cunningham also told Ms. Gibbs that she would have to stand while she worked at the front door, but that she could lean against a wall for support.

10

93.     He muttered under his breath about how, if it got to be "too much," something could be arranged.

94.     That day, Ms. Gibbs stood while working for about fifteen minutes at noon and for an hour beginning around 2:00pm, leaning against the wall.

95.     Later, Gary approached and told Ms. Gibbs that Mr. McEwen had spoken to the store manager before McEwen left for the day and that Ms. Gibbs was now permitted to use a stool.

96.     On July 6, 2021, Sedgwick sent Ms. Gibbs a notification indicating that her leave of absence was closed and that she was to return to work as of July 2, 2021, a date four days prior to the notification.

97.     The notice from Sedgwick stated "If you are released with restrictions, you may still be able to return to work. Submit restrictions to Sedgwick via email or fax. Sedgwick will review the restrictions to see if we can assist you with returning to work."

98.     Dr. Nizari had submitted the June 2021 Certificate to Sedgwick by fax.

99.     On July 7, 2021 at about 2:55pm, Ms. Gibbs complained by telephone to Wal-Mart's Global Ethics and Compliance Program and spoke with a representative that would not identify themselves.

100.    Ms. Gibbs complained about McEwen telling Ms. Gibbs to go back on leave if she could not work.

101.    Ms. Gibbs complained about Mr. Cunningham telling Ms. Gibbs that Ms. Gibbs had to stand.

102.     On July 8, 2021, Ms. Gibbs filed a worker's compensation claim related to her foot injury.

103.     On or about July 14, 2021, Mr. McEwen mocked Ms. Gibbs for walking.

104.     Ms. Gibbs was assisting a customer who needed a cart.

105.     Ms. Gibbs walked about 100 yards to get the cart and found Mr. McEwen and Gary waiting at her destination, watching Ms. Gibbs approach.

106.     Mr. McEwen said to Gary, loud enough for Ms. Gibbs to see, "She's coming to get a riding cart."

107.     Mr. McEwen then cheered Ms. Gibbs on, humiliating her in front of the other associates.

108.     Sometime around the middle of July, Ms. Gibbs noticed that two colleagues, Demeshia Carter and Erica Harrel stopped filling in for hosts and hostesses on their breaks.

109.     On July 30, 2021, Hazel Burns, an Ethics Investigator for Wal-Mart, called Ms. Gibbs to discuss Ms. Gibbs's encounters with McEwen and Cunningham.

110.     Ms. Gibbs reported that she was now being permitted to use a stool when not doing ambulatory tasks.

111.     On or about August 4, 2021, Mr. McEwen approached Ms. Gibbs and asked her what she had done with her disability forms.

112.     Ms. Gibbs reported giving them to Ms. Langhorne, who she understood to have put them on Mr. Cunningham's desk after attaching a sticky note.

113.     Mr. McEwen made a comment about how giving them to Ms. Langhorne may have been part of "the problem," but he did not elaborate on what problem he was referring to.

12

114.    Mr. McEwen then asked if Ms. Gibbs had seen Mr. Cunningham's desk, and, when Gibbs answered in the negative, characterized it: "It's a mess. He doesn't clean up after himself."

115.    On August 6, 2021 at 1:52pm, Ms. Gibbs received an automated email from the Wal-Mart Service Portal that read:

> Thank you again for contacting Walmart Ethics. Your concern is being investigated. This process normally takes 4-6 weeks. Confidentiality in this matter is important to us, both out of respect for all parties involved and to ensure a fair and reliable investigation.

> Walmart does not tolerate retaliation against someone for reporting concerns. If you believe that you experienced retaliation for reporting your ethics concern, please tell us.

> Thank you for allowing us to look into this situation.

> ** Please do NOT reply to this email address **

116.    On the same day at 1:54pm, Ms. Gibbs received a second automated email from the Wal-Mart Service Portal that read:

> Susan,

> Thank you for speaking up and allowing us to investigate this situation. We have reviewed this matter, and the case is now closed.

Out of respect for the individual, and to protect privacy and confidentiality, we cannot release specific details about the outcome. We partnered with the business, as needed, to address these concerns.

Walmart does not tolerate retaliation against someone for reporting concerns. If you believe that you experienced retaliation for reporting your ethics concern, please tell us.

** Please do NOT reply to this email address **

117.    At some point around September 7, 2021, Mr. Cunningham's employment at the Charlottesville Store ended.

118.    On or about September 20, 2021, Ms. Gibbs requested an open door meeting with the new store manager, Brandon (Ms. Gibbs does not recall his last name).

119.    They had that closed-door meeting on or about September 22, 2021.

120.    There, Ms. Gibbs explained her situation, including her concerns that she'd been retaliated against for complaints to management and that she was not being accommodated for her disability.

121.    Brandon asked Ms. Gibbs if a "court date" had been set yet and said that, if it had, he could not speak with her.

14

122.    He told Ms. Gibbs that those staffing the on-sight check would be required to "keep an eye on it," perhaps referring to Ms. Gibbs's need to stay off her feet in accordance with Dr. Nizami's instructions.

123.    He also told Ms. Gibbs to talk to the new, not-yet-arrived HR staff member, when they arrived, about reasonable accommodations.

124.    On September 23, 2021, Ms. Gibbs's foot hurt so much that she "called out" of work and lost a day's pay.

125.    Again on September 27, 2021, Ms. Gibbs's foot hurt enough that she called out from work.

126.    On October 1, 2021, Ms. Gibbs spoke with the new HR staff member, People Lead Dyshanta Jones.

127.    Ms. Jones started searching for forms from Sedgwick related to Ms. Gibbs's accommodation.

128.    Then, Assistant Manager Nicole Johnson entered the room to see what was going on.

129.    Neither Jones nor Johnson could find Ms. Gibbs's disability paperwork.

130.    Ms. Johnson told Ms. Gibbs that Ms. Gibbs would have to speak with Sedgwick about the problem and that Dr. Nizari would be obliged to resubmit paperwork.

131.    Ms. Gibbs told Ms. Johnson that Gibbs had a copy of the documents.

132.    Ms. Johnson told Ms. Gibbs to bring them in.

133.    Ms. Gibbs then complained that once, she had been obliged to spend four hours on the phone with Sedgwick.

15

134.    Ms. Johnson did not respond.

135.    On October 6, 2021, Ms. Gibbs used Sedgwick's automated telephone system.

136.    After about thirty minutes Ms. Gibbs was connected with a representative named Jaden.

137.    Ms. Gibbs reported Wal-Mart's loss of her medical records.

138.    Ms. Gibbs also told Jaden that the store needed recommendations about Ms. Gibbs's need for accommodation.

139.    On October 7, 2021, Ms. Gibbs gave Ms. Jones replacement copies of Ms. Gibbs's disability paperwork, including the January, March, April, and June Certifications.

140.    On October 11, 2021, Ms. Gibbs's job duties required her to walk the Charlottesville Store parking lot in search of a cart pusher who had custody of the key to the propane tanks.

141.    But Ms. Gibbs struggled to find the key, being redirected multiple times which required excessive walking.

142.    Ms. Gibbs's foot began to hurt in multiple places and she left work early in pain.

143.    On October 12, 2021, Ms. Gibbs signed an Authorization to Disclose Health Information for the benefit of Wal-Mart's attorneys in her worker's compensation case, giving them permission to access her entire medical record.

144.    On or around October 15, 2021, the Charlottesville Store stopped screening individuals for COVID-19 upon entering, and the on-sight check was closed.

145.    At around the same time period, Ms. Gibbs recalls encountering Mr. McEwen while she was searching for a rideable cart for a customer.

146.   At the time, about five of the Charlottesville Store's riding carts were broken.

147.   Ms. Gibbs asked Mr. McEwen if knew when they would be repaired.

148.   Mr. McEwen said, "Eventually. Half of these people don't really need them anyway. They can walk."

149.   On October 20, 2021, Ms. Gibbs again visited Dr. Nizami.

150.   Ms. Gibbs complained to Dr. Nizami that she had been provided a stool, but was still frequently required to walk and stand.

151.   Dr. Nizami again gave Ms. Gibbs a Certificate of Illness/Injury that described Ms. Gibbs as disabled due to injury (the "October 2021 Certificate").

152.   Dr. Nizami wrote in the October 2021 Certificate: "Please allow Ms. Gibbs to continue use of post op or prescription shoe and to be seated throughout her shifts. Her condition will be reassessed in 90-120 days. Thank you."

153.   Ms. Gibbs turned the October 2021 Certificate into Wal-Mart.

154.   But Wal-Mart did not permit Ms. Gibbs to sit throughout her shifts as Dr. Nizami requested.

155.   By early November, 2021, Ms. Gibbs was frequently required to complete tasks that had her walk the entire width of the Charlottesville Store, and her foot pain continued.

156.   On November 8, 2021, Ms. Gibbs sat for a deposition in her worker's compensation case.

157.   In her deposition, Ms. Gibbs expounded on her disability, her need for an accommodation, and how Wal-Mart was not providing her simple accommodations like a walkie-talkie to request help when walking was necessary.

17

158.    Ms. Gibbs testimony included the following:

Q.    So were you or were you not given a stool to sit on at work?

A.    I was given a stool to use, but I also am required to be on my feet a great deal.  Part of that reason is because we have no electronic means of communication.  If there's a problem I need management for, I have to walk to find a manager.

I have to walk to put carts away.  I have to walk the parking lot, looking for an attendant who has a key to the propane-storage unit, to help a customer with that.  I have to -- I spend, I'm guessing at least half my time on my feet, walking, putting pressure on the injury.

Q.    Why did you agree to walk against your doctor's wishes?

A.    Because Ken told me if I couldn't do my job, to go back on leave until I could.  I could not afford to do that because Sedgwick denied me short-term disability.

159.    On November 21, 2021, Store Manager Brandon pushed a group of empty carts to Ms. Gibbs, for her to put away, which required her to work on her feet against Dr. Nizari's instructions.

160.    Again on November 22, 2021, Store Manager Brandon pushed a group of carts to Ms. Gibbs, for her to put away, again requiring her to work on her feet against Dr. Nizari's instructions.

161.    Also, On December 17, 2021, Store Manager Brandon again pushed a group of carts toward Ms. Gibbs, for her to put away, requiring her to work on her feet against Dr. Nizari's instructions.

162.    In completing these tasks, Ms. Gibbs did not wish to violate her doctor's instructions, and she didn't want her foot to hurt worse. But she could not afford to lose her job so she complied.

163.    In January 2022, Ms. Gibbs continued to routinely perform tasks requiring her to walk.

164.    On January 7, 2022, for example. Store Manager Brandon again pushed a group of carts to Ms. Gibbs to put away, requiring her to work on her feet against Dr. Nizari's instructions.

165.    On January 11, 2022, Ms. Gibbs learned from Dr. Nizari that her foot had improved and her bone appeared to have healed.

166.    Then, in a January 19, 2022 appointment with Dr. Nizari, Dr. Nizari told Ms. Gibbs that her arthritis would continue to be an issue and that if she walked too much she could expect more difficulties.

167.    And by early February 2022, Ms. Gibbs was still being required to walk the width of the Charlottesville Store frequently.

168.    On February 17, 2022, Ms. Gibbs sent the EEOC an update surrounding her concerns about an ongoing failure to accommodate her injured foot.

169.    And throughout March, Ms. Gibbs was continuing to be required to perform tasks that required her to frequently walk.

170.    But when Ms. Gibbs would shop in the Charlottesville store for herself, she would ride a cart to stay off her feet.

171.    On March 17, 2022, Ms. Gibbs requested from the EEOC, and received by email, a notice of right to sue.

172.    On March 31, 2022, Ms. Gibbs missed a day of work because of foot pain.

173.    Again throughout April 2022, Ms. Gibbs was required to be on her feet frequently.

174.    On April 18, 2022, Ms. Gibbs again called out of work because of foot pain.

175.    Then, on April 20, 2022, Ms. Gibbs had another appointment with Dr. Nizari complaining of ongoing pain in her foot.

176.    In the Certificate of Illness/Injury that Dr. Nizari provided, she again called Ms. Gibbs disabled by injury (the "April 2022 Certificate").

177.    She further wrote, "Please allow Ms. Gibbs to continue use of post op or prescription shoe and to be seated throughout her shifts. She is to limit standing/walking to less than 10 minutes of every hour of her shift. Her condition will be reassessed in 90-120 days."

178.    On April 25, 2022, Ms. Gibbs gave the April 2022 Certificate to People Lead Dyshanta Jones.

179.    And that same day, Ms. Gibbs left work two hours early because of the pain in her foot and leg after washing windows on her feet for 45 minutes.

180.    Ms. Gibbs called out of work again due to pain on April 28, 2022.

181.    During May 2022, Ms. Gibbs was still required to spend significant time on her feet, despite Dr. Nizari's instructions.

182.    And on or around May 5, 2022, Wal-Mart's management decided to move the location of Ms. Gibbs's stool, which increased the amount of time she must work on her feet.

183.    On May 17, 2022, Ms. Gibbs received a secure message from Dr. Nizari that indicated Ms. Gibbs's most recent MRI showed "Unchanged fluid signal and possible low grade partial tearing of the first MTP lateral collateral ligament and capsule, which may represent chronic injury and early degenerative changes."

184.    On May 30, 2022, with her foot continuing to give her pain, and with pain spreading into her leg and hip , Ms. Gibbs again called out of work.

185.    And in June 2022, to this date, Ms. Gibbs has continued to be required to walk and stand on her feet, continuing to increase her foot pain.

## COUNT I

**Failure to Accommodate a Known Disability in Violation of the ADA and the VHRA**

186.    Ms. Gibbs incorporates every preceding allegation within this Count I.

187.    Ms. Gibbs is a qualified individual with a disability.

188.    She is qualified, as demonstrated by her more than six years of service at the Charlottesville Etore.

189.    She is also qualified because Wal-Mart maintains a document titled "Customer Host Roles and Responsibilities," all of which Ms. Gibbs can and does perform.

190.    Ms. Gibbs's foot pain, whether caused by her diagnosed arthritis, a fracture, or chronic injury or degenerative changes, substantially limits her ability to walk, as described in the paragraphs above.

191.    Wal-Mart has, on multiple occasions, been informed about the nature and extent of Ms. Gibbs's disability, the pain she experiences when required to walk, and her need to be off her feet throughout her shift.

192.    Wal-Mart has failed to grant Ms. Gibbs the accommodation she has requested multiple times, or any other that might permit her to perform her job functions while remaining seated.

193.    And the Charlottesville Wal-Mart is routinely staffed sufficiently that Ms.Gibbs should not be expected to stand against her doctor's instructions.

194.    Thus, an accommodation that would work for Ms. Gibbs, and which she has requested, would be provisioning her a walkie talkie so she could request assistance from a more-mobile colleague when walking was required.

195.    Similarly, Wal-Mart could assign her duties that permit her to remain seated.

196.    But Wal-Mart, through its agents, has repeatedly ignored, belittled, and mocked Ms. Gibbs's need for accommodation, failing to comply with the ADA.

197.    It has nominally provided Ms. Gibbs a stool to sit on, though not consistently.

22

198.    But even this accommodation is imperfect because the nature of Ms. Gibbs's assigned tasks require her to stand up off of the stool and work on her feet.

199.    As a result, Ms. Gibbs has suffered harm in the form of lost wages when she has taken off from foot pain, an exacerbation of her medical condition and disability, and emotional distress.

## COUNT II

**Hostile Work Environment Because of Disability in Violation of the ADA and VHRA**

200.    Ms. Gibbs incorporates every preceding allegation within this Count II.

201.    Wal-Mart's staff, with knowledge of Ms. Gibbs' disabilities, subjected her to unwelcome harassment because of her disabilities.

202.    Taken together, that harassment is sufficiently severe and pervasive to alter the terms and conditions of Ms. Gibbs's employment.

203.    Some of that harassment occurred following, and despite, Ms. Gibbs's complaints to Wal-Mart.

204.    But the facts described above also demonstrate that any anti-harassment or ant-discrimination policy that Wal-Mart employs at its Charlottesville Store is ineffective.

205.    Thus, there is a basis to impose liability upon Wal-Mart for the hostile work environment the harassment created.

206.    As a result of that hostile work environment, Ms. Gibbs suffered harm in the form of emotional distress.

## COUNT III

**Retaliatory Hostile Work Environment in Violation of the ADA and the VHRA**

207.    Ms. Gibbs incorporates every preceding allegation within this Count III.

208.    Ms. Gibbs engaged in protected activity when she requested reasonable accommodations and complained about harassment and Wal-Mart's failure to accommodate her known disabilities.

209.    Ms. Gibbs also engaged in protected activity when she filed a charge of discriminaiton with the EEOC and furthered that charge.

210.    Wal-Mart's staff, with knowledge of Ms. Gibbs' protected activity, subjected her to unwelcome harassment because of her disabilities.

211.    Taken together, that harassment is sufficiently severe and pervasive to alter the terms and conditions of Ms. Gibbs's employment.

212.    But for Ms. Gibbs's protected activity, Wal-Mart's agents would not have subjected Ms. Gibbs to that hostile work environment.

213.    As a result of the hostile work environment, Ms. Gibbs suffered harm in the form of emotional distress.

**RELIEF DEMANDED**

214.    Ms. Gibbs requests from the Court judgment in her favor on all counts.

215.    Ms. Gibbs requests injunctive relief, to include preliminary injunctive relief, requiring Wal-Mart to grant to her a reasonable accommodation that will allow her to perform the essential functions of her position without risking or causing additional exacerbation of her disability.

216.    Ms. Gibbs requests money damages, including compensatory damages for non-economic harms, and punitive damages because Wal-Mart's actions indicate it acted with

malice or reckless indifference toward Ms. Gibbs's rights, all in an amount to be determined by a jury at trial but in no event less than one dollar.

217.    Ms. Gibbs requests that judgment include compensation for her reasonable attorneys' fees.

218.    Ms. Gibbs requests from the Court any other relief that the Court finds just and proper.

219.    Ms. Gibbs requests pre- and post-judgment interest, to the fullest extent permitted by law.

**MS. GIBBS DEMANDS TRIAL BY JURY ON ALL OF HER CLAIMS**

Dated: June 15, 2022

Respectfully Submitted,


/s/

Jacob M. Small (VSB # 84460)
Attorney for Susan Gibbs
J. Madison PLC
1750 Tysons Boulevard
Suite 1500
McLean, Virginia 22101
P (703) 910-5062
F (703) 910-5107
jmsmall@jmadisonplc.com